UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:20-CV-251-DCLC-DCP |
| WESLEY FINANCIAL GROUP, LLC, *et al.*, | ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court are Plaintiffs' Motions for Sanctions [Docs. 116 and 139]. By way of background, on April 4, 2023, the parties appeared before the Court on Plaintiffs' Emergency Motion to Stay Briefing on Second Motion for Sanctions and Request for a Hearing [Doc. 151].[1] Because this motion related to Plaintiffs' Motions for Sanctions [Docs. 116 and 139], the parties also generally discussed the issues Plaintiffs raise in those motions. Attorneys Richard Epstein, Phillip Silvestri, and Robert Vance appeared on behalf of Plaintiffs. Attorneys John Quinn, Wayne Ritchie II, and James Stovall appeared on behalf of Wesley Financial Group, LLC ("Wesley") and Charles William McDowell, III ("McDowell") (collectively, the "Defendants"). Following the hearing, the parties filed supplemental briefs [Docs. 175, 176, 189, and 190]. For the reasons explained below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motions

---

[1] As further explained below, following the motion hearing, Plaintiffs reported to Chambers via email that they were no longer seeking the discovery requested in their motion [Doc. 172]. The Court therefore denied this motion as moot [*Id.*].

[**Docs. 116 and 139**].

## I. FACTUAL BACKGROUND

The Court has detailed the allegations in this case several times [*See* Docs. 34, 62, 63, 106]. In summary, Plaintiffs market, sell, and manage vacation destinations throughout the world [Doc. 103 ¶ 1]. Plaintiffs allege that Wesley is an unregulated business whose sole purpose is to cancel another business's valid and enforceable contracts [*Id*. ¶ 2]. Charles McDowell ("McDowell") is Wesley's founder and Chief Executive Officer [*Id*. ¶ 3]. Plaintiffs claim that Wesley has made a business of and monetized the tort of tortious interference with contract and that it targets and disrupts valid contracts between timeshare developers and their customers [*Id*. ¶¶ 2–3]. Plaintiffs allege false advertising under the Lanham Act, 15 U.S.C. § 1125(a), violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, *et seq*., and engagement in unauthorized practices and conduct [*Id*. ¶¶ 82–130].

At the heart of the instant disputes is the Protective Order in this case [*See* Doc. 63 and 72]. The parties agreed that a protective order was necessary, but they disagreed as to the parameters of the protective order—that is, whether the protective order should include an attorney's eyes only ("AEO") provision. Defendants wanted an AEO provision in order to protect the identity of their current customers [Doc. 63 pp. 5–8]. Plaintiffs disagreed that an AEO provision was appropriate [*Id*. at 3–5]. The Court noted that the Middle District of Tennessee had recently addressed a similar issue with similar arguments, and the undersigned found the decision persuasive [*Id*. at 17 (citing *Westgate Resorts, Ltd. v. Wesley Fin. Grp., LLC*, No. 3:20-CV-00599, 2021 WL 679292, at *1 (M.D. Tenn. Feb. 22, 2021))]. Thus, the Court found that Defendants had established good cause for an AEO designation because the requested current customer information constituted especially sensitive information [*Id*.]. The Court directed the parties to

2

meet and confer and to submit a protective order in accordance with the Court's ruling, and the Court entered the Protective Order on September 16, 2021 [Doc. 72]. Moving forward, Wesley would be able to designate its current customers as AEO but would de-designate them when they became former customers.

On May 26, 2022, Plaintiff filed a Motion to Modify the Protective Order ("Motion to Modify") [Doc. 82]. Plaintiffs stated that it created a program called "Transitions Program," which provides their customers an option to terminate their timeshare interests, and they created the program as a response to the growing number of timeshare exit companies. Plaintiffs explained that the Transitions Program allows owners to relinquish their timeshare interests without using a timeshare exit company. Plaintiffs noted, however, that in order to utilize this program, a timeshare owner cannot be associated with a timeshare exit company and that in order to relinquish their timeshares, owners must sign an affidavit ("Transitions Affidavit" or "Affidavit") attesting that they have not paid any third-party consideration in an attempt to exit their timeshare interest. If the customer does not sign the Affidavit, the customer cannot terminate the timeshare. In their motion, Plaintiffs claimed to have uncovered evidence that Wesley engaged in the subornation of perjury and the unauthorized practice of law in relation to the Transitions Affidavit. In summary, Plaintiffs argued Wesley should not be given AEO protection as to its current customers because of its alleged bad acts. Plaintiffs also argued that the AEO designation severely prejudiced their ability to prosecute their case.

Wesley responded that Plaintiffs submitted an old policy created by its former in-house counsel, Stephen Grauberger ("Grauberger") [Doc. 87]. Wesley explained that Grauberger was terminated in June 2021, and Jarrad Lutton, the employee who implemented the policy, was terminated in August 2021. Wesley claimed that it updated its policy several months ago and

3

implemented wide-ranging changes to some of its practices. It further represented that it had already disclosed (or would shortly disclose) the identity of the customers who received this old advice[2] without any AEO designations. Wesley explained that it designates the identity of its customers as AEO until it has completed its services, at which time it de-designates their identities, allowing Plaintiffs to fully investigate the facts as they relate to those customers.

The Court ordered Wesley to disclose the identity of its customers who received the Affidavit Advice, to the extent it had not already done so [Doc. 106] ("October 7 Order"). The Court, however, declined to modify the AEO provision to eliminate the protection of the identities of all Defendants' customers who qualify for, or are attempting to utilize the Transitions Program [*Id*.].

## II.     PROCEDURAL BACKGROUND

Following the Court's October 7 Order, Plaintiff filed their Motion for Sanctions ("First Motion for Sanctions") [Doc. 116] pursuant to Rule 37 of the Federal Rules of Civil Procedure and the Court's inherent authority. Specifically, Plaintiffs allege that Wesley did not comply with the October 7 Order. Plaintiffs assert that "sanctions are appropriate because Wesley was ordered to fully review its AEO designations and provide a log containing the customers' names that received Defendant's [Affidavit Advice]" by October 21, 2022, but failed to comply in all but a cursory manner, demonstrating a complete disregard for this Court's Order" [*Id*. at 1].

According to Plaintiffs, on October 21, 2022, Wesley identified only five customers who received the Affidavit Advice and would only agree to remove its AEO designations for two of them. In order to arrive at the five customers, Plaintiffs claim that Wesley conducted a restrictive search and that its "counsel abdicated its responsibility and relied solely on Wesley to supposedly

---

[2]     The Court will refer to the old advice as the "Affidavit Advice."

comply with the Court's Order, and did not review or otherwise ensure Wesley complied" [Doc. 119 p. 3]. Citing to its Motion to Modify, Plaintiffs argue that they identified audio and policy documents related to the Affidavit Advice, so Wesley's email search was not sufficient. While Wesley states that "it 'erroneously' provided the Affidavit Advice to some of its 'debt' customers (who generally do not get an affidavit)," and therefore "would not de-designate those individuals' identities[,]" Plaintiffs contend that Wesley's position is at odds with the October 7 Order [*Id*. at 8]. In addition, Plaintiff states that Wesley's refusal to de-designate three of the five customers violates the October 7 Order. Plaintiffs request that the Court order immediate compliance therewith and an award of fees and costs.

Wesley responds to the motion that it "attempted to comply with the [October 7] Order and provide a log of customer names on the date ordered by the Court" [Doc. 128 p. 1]. Wesley insists that it attempted to run additional searches to address Plaintiffs' concerns during the parties' meet and confers, but Plaintiffs only "raised unspecified objections to the searches" prior to filing their motion [*Id*.]. Wesley states, "Now that Plaintiffs have actually articulated the specific nature and basis for their concerns, [it] has been able to review its search process in detail, has found errors, and has cured the deficiencies" [*Id*.]. While acknowledging that it made inadvertent errors, Wesley states that it "corrected the errors and produced an updated current customer list and updated log of customers who received the [Affidavit Advice]" [*Id*. at 2]. According to Wesley, its "error was harmless, as the revised log contains only two (2) current zero debt customers" whose names were not previously disclosed [*Id*.].

In addition, Wesley states that Plaintiffs' Motion to Modify and the October 7 Order "were specific to those Wesley customers who received the [Affidavit Advice] in connection with an affidavit required by Plaintiffs for customers to participate in their Transitions Program—not any

5

current customer who may have accidently been sent an email containing the [Affidavit Advice] who was ineligible for the Transition Program and was never involved in the submission of the subject Affidavit" [*Id*. at 3]. In order words, Wesley states that "it is clear from the briefing and the Court's Order that only Wesley's 'Zero Debt' customers involved in submitting an affidavit as part of Plaintiffs' Transitions Program were at issue in the matter currently in dispute" [*Id*. at 4]. In support of its position, Wesley filed a Declaration of John Quinn,[3] its counsel, who explains how Wesley keeps and updates its two customer lists (i.e., former customers and current customers) and its efforts in complying with the October 7 Order [*Id*. at 5–9]. Wesley explains as follows:

> Early in this case, Wesley produced two lists of customers—a list of former customers, and a separate list (with appropriate AEO designations) for current customers. The initial current customer list was voluminous, containing a total of 982 unique individuals. Due to the volume of this list, Wesley complied with its obligations of de-designating customers by running periodic searches to determine which customers have been placed in an inactive status, and then providing a new list with those customers names, thereby removing the AEO protection and allowing Plaintiffs to search for corresponding documents relating to those individuals in their own records.

[*Id*. at 5 (citations omitted)].

Wesley explains, however, that several months ago, it changed this above procedure because Plaintiffs requested additional fields in its Salesforce client database. In order to comply, "Wesley prepared two large lists of Salesforce information—one for former customers, and another for current customers" [*Id*. at 6 (citation omitted)]. "In other words, rather than de-designating specific names, Wesley provided new comprehensive lists of current and former

---

[3]     John Quinn's Declaration is [Doc. 131-SEALED], but Wesley quotes portions of it in its brief. The Court placed John Quinn's Declaration under seal given that it reveals the identity of its current and former customers [Doc. 164].

6

customers" [*Id.*].  Wesley further explains, "To generate these separate lists, Wesley relied upon the various statuses or datapoints that have historically been entered into Wesley's Salesforce database when it is confirmed that Wesley has successfully provided its service to a given individual" [*Id.* (other citation omitted)].  During its review of these large spreadsheets, Wesley discovered errors.  It explains:

> [T]he "current customer" list contained the names of customers who had terminated their contracts with Wesley and were therefore also not "current" customers. To address this issue, Wesley created new lists of customers (this time broken up into former, terminated, and current), which were produced on October 3, 2022—days before the Court's Order was issued.

[*Id.* (citation omitted)].

With respect to its efforts to comply with the October 7 Order, Wesley states that it utilized a three-step process:

> First, based upon conversations with knowledgeable employees, it was determined that the advice at issue was typically provided by means of copying-and-pasting the language into an email, or by attaching a copy of a document containing that advice to an email. While it is possible that the same information may also have been communicated orally, it was determined that it was neither possible nor necessary to review all recordings. Even in cases where there are oral discussions, the advice was also typically sent by email; moreover, Wesley has no method for searching audio transcriptions, and there are thousands of hours of recorded calls related to the population of customers at issue. . . . As a result, in order to determine which customers received the [Affidavit Advice], Wesley ran a search of its entire email database for all instances in which a specific two-sentence phrase of that [Affidavit Advice] appeared.[4]
>
> Second, after these emails had been identified, Wesley used software to create a list of the email addresses of everyone who

---

[4]    Wesley also explains that it was concerned "that it [would] be impossible to definitely determine whether the advice communicated orally constituted [Affidavit Advice]" [Doc. 128 p. 8].  For instance, Plaintiffs identified an individual who they claim received the Affidavit Advice by audio, but a representative with Wesley only discussed one of the five talking points contained in the policy document relating to the Affidavit Advice [*Id.* at 8 n.1].

received an email containing the [Affidavit Advice].

Third, this list was compared against a list of current customers, and all individuals whose email addresses appeared on both lists were identified. After this was done, both Wesley and its counsel reviewed the documents associated with these individuals to confirm that they did, in fact, receive the [Affidavit Advice] and were still designated as current customers.

[*Id*. at 7–8 (citations omitted)]. Wesley states that its mistake occurred at the third step because it "used an improperly coded list of current customers instead of the list of current customers produced on October 3" [*Id*. at 8].[5] Wesley states:

As a result, there were many individuals who were designated as Attorneys' Eyes Only in Wesley's October 3 list of current customers, but whose names did not appear on the list being used to conduct the search and therefore were not identified. This mistake explains the high number of names identified by Plaintiffs' counsel which did not appear on Wesley's initial log.

[*Id*. at 8–9]. In any event, Wesley's search identified five customers but only two of those customers were zero debt clients who received the Affidavit Advice. Wesley adds that "[t]he remaining three were sent the [Affidavit Advice] by accident, as none of them are eligible for Transitions, none of them applied for Transitions, and none of them received the Transitions affidavit" [*Id*. at 9 (citation omitted)]. Wesley adds that Plaintiffs refused to participate in a meaningfully meet and confer and that it cured all deficiencies upon learning of Plaintiffs' complaints about the prior search. Awarding sanctions under these circumstances, according to Wesley, would be unjust.

Plaintiffs reply that Wesley "confesses to a knowingly abbreviated search of a purposefully incomplete universe of documents" [Doc. 136 p. 2]. Plaintiffs maintain that the email search is

---

[5]     Wesley notes that even if it had used the October 3 list "it still would not have been accurate given the mistakes that occurred in generating that list" [Doc. 128 p. 21].

overly restrictive and that the October 7 Order required Wesley to identify all customers not just debt customers. Claiming that Wesley has exploited its inaccurate designation list, Plaintiffs state that "Wesley's *mea culpa* cynically takes the form of over 750 de-designated now 'former' customers, nearly 50% more than Wesley has, until now, claimed, and critically, a near doubling of the number of 'former' 'debt' customers upon which [Plaintiffs'] damage claim is based" [*Id.*]. Plaintiffs argue that they explained to Wesley the issues with its search, and they maintain that they are entitled to sanctions.

On January 17, 2023, Plaintiffs filed another Motion for Sanctions ("Second Motion for Sanctions") [Doc. 139], seeking sanctions pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure and the Court's inherent power. For grounds, Plaintiffs state that Defendants knowingly and intentionally violated the Court's AEO Order [Doc. 63] entered on July 20, 2021. Plaintiffs explain that "when pressed on a violation of [the October 7] Order, Wesley admits its abuse of the AEO Order by de-designating 764 'current customers,' many of whom should never have been designated AEO in the first place" [Doc. 140 p. 2]. According to Plaintiffs, on December 19, 2022, "Wesley advised [Plaintiffs] that the AEO designations it had steadfastly defended were wrong" [*Id.* at 6]. Plaintiffs state that this revelation meant that Wesley grossly underreported its 'former' customers, to which the AEO designation should not have applied.

Based on the above, Plaintiffs seek three sanctions: (1) payment of attorneys' fees incurred in identifying and litigating the issue of whether Wesley misclassified its 'former' customers; (2) amendment to the AEO Order to eliminate the availability of AEO entirely; and (3) a finding that, for each of the debt customers who were incorrectly classified as current customers, the reasons the owners stopped making payments to Plaintiffs was because of Wesley, and that they would not have stopped paying [Plaintiffs] but for Wesley" [*Id.* at 14]. These sanctions, according to

Plaintiffs, "fit Wesley's repeated misconduct" [*Id.* at 15]. In addition, in light of Wesley's mass de-designation, Plaintiffs request procedural remedies, including several extensions of the deadlines in this case.[6] Plaintiffs also seek additional customer depositions.[7]

Following the filing of Plaintiffs' Second Motion for Sanctions, on January 20, 2023, the parties filed a joint motion to amend the scheduling order and continue the trial [Doc. 145]. The parties represented in their motion:

> Each of the prior extensions were based on the normal progression of this litigation, namely a large volume of discovery, and miscellaneous discovery disputes. This request presents a different issue, namely that Defendants recently advised that they were having to redesignate more than 750 customers who had been previously disclosed as "current" customers, whose identities should be protected as Attorneys' Eyes Only ("AEO") information based on this Court's prior orders, instead of "former" customers, whose identities could be disclosed to Plaintiffs. While Wesley contends that some had recently become "former" customers in the normal course, Wesley advised that a majority of them were incorrectly designated when initially disclosed and contends that this was due to a coding error.

[*Id.* at 2]. United States District Judge Clifton Corker set a motion hearing on the parties' joint motion for January 30, 2023 [Doc. 146]. Based on Wesley's de-signation and Plaintiffs' inability to adequately prepare for trial in light thereof, Judge Corker continued several deadlines and stayed the trial date [Doc. 149].

On February 14, 2023, Wesley responded in opposition to Plaintiffs' Second Motion for Sanctions [Doc. 150]. Wesley explains as follows:

> What *is* true is that in December 2022, Wesley discovered what it believed to be an error in its process of moving customers from the list of current customers to the list of former customers (and, in turn,

---

[6]     As noted below, the District Judge has already continued the deadlines in this case [Doc. 149].

[7]     The parties later agreed to conduct seven-seventy (77) additional depositions [Doc. 67].

de-designating the AEO status of those customers). Wesley timely and voluntarily informed Plaintiffs of this error and provided (what it believed at the time to be) a corrected list of 764 customers who should have previously been moved from the current customer list to the former customer list but were not (due to what Wesley believed to be a coding error in the way its Salesforce program catalogued certain customers). In response, Plaintiffs filed the pending motion for sanctions. A subsequent investigation by Wesley, however, has revealed that the error Wesley believed it had discovered (and remedied) in December was not as Wesley initially believed. As it turns out, the majority of the 764 customers Wesley believed it had erroneously failed to de-designate were actually still current customers who should not have been de-designated all. Indeed, of the 764 customers de-designated by Wesley in December, only 123 were actually former customers who should have been de-designated prior to October.

[*Id*. at 2]. Acknowledging that its errors "are frustrating[,]" Wesley contends that "they do not rise to [the] level of sanctionable conduct" [*Id*. at 3]. In support of how these errors occurred, Wesley relies on the Declaration of Jessica Kanaski Herrington ("Herrington") [Doc. 150-1], its Director of Data & Analytics, and the Declaration of Ashley Whitaker ("Whitaker") [Doc. 150-2], its Director of Compliance. Citing to Herrington's Declaration, Wesley asserts that "a combination of a Salesforce coding error and human error (in inputting customer information into Salesforce) caused some customers to be included on the wrong list" [Doc. 150 p. 4 (citation omitted)]. Herrington states:

> In total, of the 764 customers that Wesley moved from its current customer list to its former customer list in December: 547 should not have been moved at all and, instead, should have remained on the current customer list; 94 became former customers *after* the October 2022 lists were provided; and 123 were, indeed, former customers that should have been de-designated by Wesley prior to October 2022.

[Doc. 150-1 p. 10].

Plaintiffs did not file a reply but instead filed a motion requesting that the Court stay briefing on their Second Motion for Sanctions and Schedule a Hearing [Doc. 151]. As mentioned

11

above, the parties appeared before the Court on April 4, 2023. Plaintiffs argued that during this entire litigation, Wesley has been unable to accurately confirm who is a former customer. Wesley acknowledged that it had made some mistakes but insisted that it did not act intentionally. After hearing the parties' oral arguments, the Court proposed that Plaintiffs be allowed to designate a person or small team to confirm the accuracy of Wesley's designations moving forward, and the parties accepted this proposal [*See* Doc. 166]. The Court thereafter modified the Protective Order to allow certain individuals with Plaintiffs to review Wesley's AEO designations (*i.e.*, its current customers) [*Id.*].

Given that this modification resolved the primary issue—Wesley's inaccurate designations—the Court allowed the parties to file supplemental briefs to explain what relief, if any, is appropriate. On April 11, 2023, Plaintiffs reported to Chambers that they were no longer seeking discovery into how Wesley's inaccurate designations occurred [*See* Doc. 172]. Later, the parties filed their supplemental briefs [*See* Docs. 175, 176]. On August 24, 2023, Plaintiffs filed another supplemental brief [Docs. 189], and Defendants responded [Doc. 190].

## III.    STANDARD OF REVIEW

Plaintiffs primarily seek sanctions pursuant to Rule 37 and the Court's inherent authority.[8] Rule 37 provides sanctions for not complying with court orders. Specifically, that rule provides:

> **(A)** *For Not Obeying a Discovery Order.* If a party or a party's officer, director, or managing agent--or a witness designated under Rule 30(b)(6) or 31(a)(4)--fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the

---

[8]    In their Second Motion for Sanctions, Plaintiffs also cite to Rule 26(a), arguing that it "generally requires disclosure of individuals likely to have discoverable information that the disclosing party may use to support its defenses" [Doc. 140 p. 9 (citation omitted)]. But the parties' dispute is not whether Wesley failed to disclose its former customers—the dispute is whether Wesley failed to correctly de-designate its former customers. Plaintiffs' counsel, and now a small team with Plaintiffs, have a list of all customers.

12

court where the action is pending may issue further just orders. They may include the following:

**(i)**      directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

**(ii)**      prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

**(iii)**      striking pleadings in whole or in part;

**(iv)**      staying further proceedings until the order is obeyed;

**(v)**      dismissing the action or proceeding in whole or in part;

**(vi)**      rendering a default judgment against the disobedient party; or

**(vii)**      treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2). In addition to, or instead of, the above sanctions, a "court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expense, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

To determine the appropriate sanctions for a violation of a discovery order, district courts weigh four factors:

(1)      whether a party's failure to cooperate in discovery is due to willfulness, bad faith, or fault;

(2)      whether the adversary was prejudiced by the party's failure to cooperate in discovery;

(3)      whether the party was warned that failure to cooperate could lead to the sanction; and

13

(4)      whether less drastic sanctions were first imposed or considered.

*Victor v. Reynolds*, No. 1:20-CV-13218, 2023 WL 112459, at *4 (E.D. Mich. Jan. 5, 2023) (quoting *Freeland v. Amigo*, 103 F.3d 1271, 1277 (6th Cir. 1997)), *reconsideration denied*, No. 1:20-CV-13218, 2023 WL 4157616 (E.D. Mich. June 23, 2023).[9]  "These factors are applied more "stringently" if counsel, rather than the party, is responsible for the discovery violation." *Id*. (citing *Harmon v. CSX Transp., Inc.*, 110 F.3d 364, 367 (6th Cir. 1997)).

While "[r]eliance upon the Federal Rules of Civil Procedure is preferred," *Bard v. Brown Cnty.*, No. 1:15-CV-643, 2018 WL 11357532, at *5 (S.D. Ohio June 13, 2018), the Court has "the inherent power to impose sanctions to prevent the abuse of the judicial process." *Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485, 502 (N.D. Ohio 2013) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991) (noting that the inherent power of a court can be invoked even if procedural rules exist that sanction the same conduct)).  The Court may exercise its inherent authority only in situations where a party has acted in bad faith.  *Sinomax USA, Inc. v. Am. Signature, Inc.*, No. 2:21-CV-3925, 2023 WL 2752488, at *1 (S.D. Ohio Apr. 3, 2023) (citing *Youn v. Track, Inc.*, 324 F.3d 409, 420 (6th Cir. 2003)).  But the Court must exercise its inherent authority with caution,

---

[9]      The last factor is generally more relevant when the moving party requests dismissal or default judgment for violating orders. *See Bard v. Brown Cnty.*, No. 1:15-CV-643, 2018 WL 11357532, at *6 (S.D. Ohio June 13, 2018) ("The fourth prong is not relevant because Magistrate Judge Litkovitz imposed only a reasonable monetary sanction and not a more severe sanction such as dismissal of a claim.").  But in their Second Motion for Sanctions, Plaintiffs seek a finding of fact as a sanction [Doc. 140 p. 14].  To the extent Plaintiffs still seek this sanction, *see infra* p. 23, "[t]he fact finding sanction is a serious one.  Under certain circumstances, courts have viewed this sanction as tantamount to default judgment, particularly when the facts deemed established go the elements of the claim."  *Knox Trailers v. Clark*, No. 3:20-cv-137-TRM-DCP [Doc. 422] (E.D. Tenn. July 11, 2022) (citations omitted).

14

and "it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Chambers*, 501 U.S. at 50 (citation omitted).

## IV.    ANALYSIS

After considering the parties' filings and the presentations at the hearing on April 4, 2023, the Court finds Plaintiffs' motions [Docs. 116 and 139] well taken in part.  With respect to Plaintiffs' first motion, the Court declines to award any sanctions; however, the Court orders the parties to meet and confer to determine (1) whether searching for terms is appropriate, and if so, (2) the terms Wesley should utilize in its search.  If the parties arrive at an impasse on these issues, they may contact Chambers.  The Court further finds that Wesley must de-designate its customers who received the Affidavit Advice (to the extent it has not already done so), even if Wesley provided it erroneously.  With respect to Plaintiffs' second motion, the Court finds that under the circumstances, an award of attorneys' fees is appropriate.

### A.    First Motion for Sanctions [Doc. 119]

Plaintiffs seek sanctions pursuant to Rule 37 and the Court's inherent authority, alleging that Wesley violated the Court's October 7 Order. Specifically, Plaintiffs seek immediate compliance with the Court's October 7 Order and an award of their fees and costs.  Plaintiffs assert two primary arguments in support of their request for sanctions: (1) Wesley's search was too restrictive, and (2) Wesley's interpretation of the October 7 Order is incorrect.

First, Plaintiffs submit that Wesley violated the October 7 Order because Wesley's search was too restrictive, arguing that defense counsel did not sufficiently assist with the search; Wesley chose to search only emails, even though there was evidence in the record that there were other mediums Wesley used (*e.g.*, audio recordings) to provide the Affidavit Advice; and Wesley did not use search terms but instead ran the following script: "The timeshare company built their

15

relationship with the client on a lie. There is no concern with signing the affidavit as written" [Doc. 119 p. 3 (citation omitted)].

Wesley responds that "based upon conversations with knowledgeable employees, it was determined that the advice at issue was typically provided by means of copying-and-pasting the language into an email, or by attaching a copy of a document containing that advice to an email" [Doc. 128 p. 7 (citation omitted)]. Wesley claims that while the same information may have been orally communicated, it is not possible or necessary to review the recordings" [*Id*. (citation omitted)]. Even when the advice was communicated orally, Wesley states that "the advice was also typically sent by email" [*Id*.]. Regardless, Wesley states that it "has no method of searching audio transcriptions, and there are thousands of hours of recorded calls related to the population of customers at issue" [*Id*. at 8]. Wesley denies that its counsel was not involved with the search, stating, "To be clear, however, this was not a case of Wesley's counsel simply delegating all responsibility to the client. To the contrary, prior to the search being run, Wesley and its counsel had extensive discussions regarding the purpose of the search and the manner in which it could be conducted" [*Id*. at 7 (citation omitted)]. Wesley's information technology department then conducted a three-step process [*Id*.]. After Wesley's information technology department completed this process, "both Wesley and its counsel reviewed the documents associated with these individuals to confirm that they did, in fact, receive the [Affidavit Advice] and were still designated as current customers" [*Id*. at 8].

The Court does not find Wesley's search of only emails violates the Court's October 7 Order. In light of Wesley's representations to the Court that it does not have the capability to search audio recordings and given that the advice was generally sent by email, there is not a sufficient basis to require such an extensive search of audio records. *See* Fed. R. Civ. P.

26(b)(2)(C) (the court may, on its own, limit unreasonably cumulative or duplicative discovery).

Plaintiffs also state defense "counsel's actions in completely delegating to, and accepting the obviously inadequate search result of, its client, is particularly troubling and sanctionable" [Doc. 119 p. 7 (citation omitted)]. Attorneys have "at all times an affirmative, non-delegable duty to conduct a reasonable inquiry to ensure that [a party's] discovery responses [are] complete and correct." *Phipps v. Accredo Health Grp., Inc.*, No. 215CV02101STACGC, 2017 WL 685579, at *4 (W.D. Tenn. Feb. 21, 2017). But it does not appear to the Court that defense counsel completely delegated his duty to Wesley. Instead, Wesley and its counsel "had extensive discussions regarding the purpose and the manner in which [the search] could be conducted" [Doc. 128 p. 7 (citation omitted)]. After Wesley's technology department ran the search, defense counsel and Wesley reviewed the results [*Id*. at 8]. And when Plaintiffs' raised concerns with Wesley about its search, it "acted timely to correct both the log and the underlying issues that gave rise to th[e] deficiency" [Doc. 128 p. 14].

Plaintiffs also state that the script Wesley used is overly restrictive and that it should have used search terms. It appears to the Court that Wesley used this script because of defense counsel's discussion with Wesley, wherein "it was determined that the advice at issue was typically provided by means of copying-and-pasting the language into an email or by attaching a copy of a document containing the advice to an email" [Doc. 128 p. 7 (citations omitted)]. Based on this representation, it does not appear that a word search would have produced additional documents. [10] But the parties

---

[10]     Plaintiffs cite *Knight First Amend. Inst. at Columbia Univ. v. Centers for Disease Control & Prevention*, No. 20 CIV. 2761 (AT), 2022 WL 4124857, at *2 (S.D. N.Y. Sept. 9, 2022) to support their argument that searching full phrases is unreasonable [Doc. 176 p. 4]. But in that case, the parties briefed what specific terms should be utilized and the court noted that the defendants "must search for synonyms or common variants of a term . . . unless they can reasonable justify declining to use them." *Id*. (citation omitted).

should have participated in a meaningful meet and confer on whether a search of specific terms was necessary given that Wesley's employees copied and pasted the language into emails. Instead, the parties exchanged emails wherein Wesley asked what search terms Plaintiffs wanted it to run, and Plaintiffs responded that it was not their "duty to comply" with the October 7 Order [Doc. 118-1 ¶ 17-SEALED; Doc. 131 pp. 11–17-SEALED].[11] "[E]lectronic discovery requires cooperation between opposing counsel and transparency in all aspects of preservation and production of ESI." *Lyman v. Ford Motor Co.*, 344 F.R.D. 228 (E.D. Mich. 2023) (quoting *William A. Gross Const. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D. N.Y. 2009)). To the extent this is still an issue, given the time that has passed, the Court **ORDERS** the parties to meet and confer in good faith to determine whether searching for specific terms is appropriate. If so, the parties should discuss what search terms Wesley should use. Should the parties reach an impasse, they may contact Chambers. The Court declines to award sanctions given that Wesley offered to run additional searches to alleviate Plaintiffs' concerns. *See* Fed. R. Civ. P. 37(b)(2)(C).

Second, Plaintiffs argue that Wesley incorrectly interprets the October 7 Order. According to Plaintiffs, the Court held that anyone who received the Affidavit Advice needed to be de-designated, even if those customers received this advice erroneously. Wesley responds that Plaintiffs' Motion to Modify limited "the request for relief, to customers 'who qualify for, or are attempting to utilize, Transitions'" [Doc. 128 p. 4 (quoting Doc. 82 p. 4)]. Wesley states that "[o]nly individuals with no mortgage on their timeshare interests—a group of customers whom Wesley classifies as 'Zero Debt'—qualify for the Transitions program" [*Id.*].

---

[11]     These filings are sealed given that they contain Wesley's customers' names.

As illustrated above, the parties offer different interpretations of the October 7 Order, and the Court understands how both parties arrived at their respective interpretations—that is, the October 7 Order did not expressly limit the search to Wesley's zero debt customers, but Plaintiffs tailored their request to Wesley's zero debt customers. The Court's October 7 Order found, "Plaintiffs have presented evidence that supports their position that Defendant's [Affidavit Advice] does not warrant an AEO designation, and therefore, to the extent that Defendant has not revealed such identities, the Court **ORDERS** Defendant to fully review its AEO designations and provide a log containing the customers' names that received Defendant's [Affidavit Advice]" [Doc. 106 pp. 5–6]. Plaintiffs' underlying motion, however, sought modification of "the AEO Order to eliminate protection of the identities of all of Wesley's 'clients' who qualify for, or are attempting to utilize, Transitions[.]" [Doc. 82 p. 4]. And in their underlying brief, Plaintiffs state "[t]his [m]otion seeks limited relief from the AEO Order as it merely seeks the disclosure of the current 'Zero Debt' 'clients,' thereby obviating some of the larger concerns expressed by the Court" [Doc. 84 at 24].

Given that the October 7 Order did not expressly limit Wesley's search to its zero debt customers, the Court finds that Wesley must de-designate its customers who received the Affidavit Advice (to the extent it has not already done so), even if Wesley provided it erroneously. But the Court declines to award Plaintiffs attorneys' fees in light of Plaintiffs' specific request in the underlying motion. An award of attorneys' fees it not warranted when the non-compliant party's position was substantially justified. *See* Fed. R. Civ. P. 37(b)(2)(C). The Sixth Circuit Court of Appeals has explained that conduct is "'substantially justified' if it raises an issue about which there is a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action." *Doe v. Lexington-Fayette Urb. Cnty. Gov't*, 407 F.3d 755, 766 (6th Cir. 2005)

(citing *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).  The Court finds that Wesley's interpretation, while incorrect, was substantially justified.

### B.    Plaintiffs' Second Motion for Sanctions [Doc. 139]

Plaintiffs' Second Motion for Sanctions relates to Wesley's de-designation of approximately 764 customers' identities in December 2022 after it discovered errors [Doc. 140 p. 2].  Following the filing of this motion, Wesley performed a "subsequent investigation" that "revealed the error Wesley believed it had discovered (and remedied) in December was not as [it] initially believed" [Doc. 150 p. 2].  According to Wesley, "As it turns out, the majority of the 764 customers Wesley believed it had erroneously failed to de-designate were actually still current customers who should not have been de-designated . . . Indeed, of the 764 customers de-designated by Wesley in December, only 123 were actually former customers who should have been de-designated prior to October" [*Id.*].  At the hearing, Wesley admitted that it had made mistakes but maintained that the mistakes were not intentional [*See* Doc. 169].

The Protective Order in this case allowed Wesley to designate its current customers as AEO [*See* Docs. 63 and 72].  This AEO protection, however, ended once the current customer became a former customer.  Wesley had a continuing obligation to de-designate current customers to former customers [*See* Doc. 87 p. 8 ("Once those services have been provided, Wesley is required to de-designate their identities, allowing Plaintiffs to search their own records and fully investigate the facts as they relate to those customers.")].  Because Wesley did not comply with its obligation, the Court finds that Wesley violated the Protective Order in this case [*See* Docs. 63 and 72].

In light of this finding, the Court now turns to the four factors to determine the appropriate sanctions.  The first factor is whether Wesley's failure to cooperate in discovery was due to

willfulness, bad faith, or fault. Here, the Court finds that Wesley is at fault, although the undersigned does not find that its actions were intentional. The Court has reviewed Herrington's and Whitaker's Declarations that explain exactly how the errors occurred, which were coding and human errors [Doc. 150-1 and Doc. 150-2]. Plaintiffs state that they pointed out an issue with Wesley's designations in July 2022, but it appears to the Court that Wesley attempted to address Plaintiffs' concern, although it did not discover the actual human and coding errors until February 2023 [*See* Doc. 142-3 and Doc. 150-3]. For instance, in October 2022, when Plaintiffs' counsel raised concerns about designations, defense counsel responded:

> I think the confusion comes from the terminology used in Wesley's system. According to the employee who generated the lists, "cancelled" means only that they have received notice that the timeshare intends, at some point, to terminate their timeshare interest (e.g., by charge-off, etc.). Wesley does not actually consider them to be a former customer, however, until they receive confirmation that the contract is actually terminated. After all, until the termination is officially complete, Diamond could always put the brakes on the process even if they have sent notice of an intent to charge off (for example). When confirmation is received, the information is put in the Closed Date field, which is what we used to differentiate between current and former customers.

[Doc. 150 p. 12 (citation omitted)].

Plaintiffs state that on "April 4, 2023, Wesley finally admitted that it is entirely dependent on Diamond to determine when a customer's account is closed" [Doc. 176 p. 1]. In light of this acknowledgement, Plaintiffs contend that Wesley knew that it could never fully meet its obligations to de-designate under the Protective Order. In support of their position, Plaintiffs cite, in part, the following statements at the April 4 hearing:

> The Court: And how do you verify if it's a former client without assistance from Diamond?
>
> Mr: Quinn: Wesley can't. Because we can't disclose the current customer to Diamond, Wesley, as I said earlier, and what Ms.

Whitaker testified to in her declaration in paragraph 6, unless and until Wesley has confirmation and proof that they have been extricated from their Diamond contract, then they're still a current customer to Wesley.

[Doc. 169 p. 60]. But defense counsel further explained that Wesley can receive confirmation from the customer [*Id*. at 40]. Attorney Quinn stated:

There are times when Diamond – there is – Diamond will notify the customer by letter. Most of the times not. The evidence in the case would show that most of the time it's either up to a Wesley employee or the customer, oftentimes, to either call Diamond, "Hey, am I still – Do I still have a contract? Check their portal, their website portal with Diamond that may show you still have an active contract or not. But Wesley does not deem someone a former client in this litigation unless and until it has proof of that.

[*Id*.]. In other words, Wesley is able to determine whether a customer's timeshare was canceled by relying on its customer, but Plaintiffs simply remain in control of when the contract cancellation occurs. And notably, it is more efficient to ask Plaintiffs whether they have canceled a certain individual's timeshare instead of Wesley waiting for a customer to report back, which is one reason why the Court modified the Protective Order [*See* Doc. 166]. But this does not mean that Wesley had no way of complying with the Protective Order or that its actions, while certainly negligent, were intentional.

The second factor—whether Plaintiffs experienced prejudice—favors Plaintiffs' request. In December 2022, Wesley de-designated 764 customers from current to former. Based on this information, the parties filed a joint motion to continue [Doc. 145], which Judge Corker granted in part, noting:

[D]uring which the parties agreed that due to the recent disclosures regarding Defendants' customer designations, which form the basis for the pending motions for sanctions, an extension of the discovery and expert disclosure deadlines and a stay of the remaining deadlines in this matter are necessary to allow Plaintiffs to fully develop their case.

22

[Doc. 149 p. 1]. After receiving a continuance in the case, Wesley represented that it had made an error by de-designating 764 customers. Instead, out of the 764 customers that Wesley de-designated, 547 were still current customers that should not have been de-designated, 94 customers became former customers after October 2022, and 123 were former customers before October 2022 [Doc. 150-2 ¶ 11]. Even though Wesley was not correct in its original number, there were 123 former customers that it failed to de-designate, which would have provided Plaintiffs an earlier opportunity to engage in discovery with respect to these customers. *See Victor v. Reynolds*, No. 1:20-CV-13218, 2023 WL 112459, at *4 (E.D. Mich. Jan. 5, 2023) ("In addition to the costs imposed on Plaintiff, Defendants also prejudiced him by impairing his ability to prosecute his case."); *Wittman v. Wilson*, 95 F. App'x 752, 754 (6th Cir. 2004) (unpublished) ("[T]he existence of prejudice is clear because he undermined defendants' ability to defend this case."). And Plaintiffs' Second Motion for Sanctions triggered Wesley to investigate further to finally determine what happened. *Phipps v. Accredo Health Grp., Inc.*, No. 215CV02101STACGC, 2017 WL 685579, at *6 (W.D. Tenn. Feb. 21, 2017) ("The Court further finds that Defendant's discovery failures caused Plaintiff to incur expenses, including attorney's fees, associated with her two Motions for Sanctions.").

Wesley states that there is no prejudice to Plaintiffs given that they acknowledged "that the 77 additional depositions it has been permitted to take will themselves require the remainder of the extended discovery period to complete" [Doc. 175 p. 10]. But Wesley's position does not appreciate how its erroneous designations drastically altered the schedule in this case [*See* Doc. 149 (continuing several deadlines, staying other deadlines, and canceling the trial date). In light of the above, the Court finds Plaintiffs are prejudiced.

23

The third factor is whether the Court had previously warned Wesley that a failure to cooperate could lead to the sanction. The Court has not previously warned Wesley that the failure to cooperate could lead to certain matters being established or other sanctions.

The final factor is whether the Court imposed or considered less drastic sanctions.[12] As noted above, Plaintiffs request the following sanctions in their opening brief: (1) attorneys' fees, (2) amending the AEO order to eliminate the availability of AEO entirely,[13] and (3) deem breach and causation to be admitted relative to the newly disclosed customers. With respect to their latter sanction, it is not clear to the Court that Plaintiffs continue to seek this sanction as they do not mention it in their supplemental brief [*See* Doc. 176].[14] To the extent that they are still that seeking it, the Court declines to recommend that breach and causation be established as to the newly disclosed customers given that Wesley's actions were negligent, and it was forthcoming about its mistakes. Even though Wesley's de-designations were untimely in light of its continuing obligation to de-designate, Plaintiffs are able to "fully prosecute their case moving forward." *See Knox Trailers v. Clark,* No. 3:20-cv-137-TRM-DCP [Doc. 422 p. 14] (E.D. Tenn. July 11, 2022) ("Yet, given the procedural posture at the time the information came to light, the ultimate disclosure of the concealed evidence, and Plaintiffs ability to fully prosecute their case moving

---

[12]     This factor is typically utilized when considering whether to dismiss the case or enter default judgment as a sanction. *Peltz v. Moretti*, 292 F. App'x 475, 479 (6th Cir. 2008) (citation omitted). But as noted above, deeming certain matters to be established is "tantamount to a default judgment." *Knox Trailers v. Clark*, No. 3:20-cv-137 [Doc. 422 p. 14] (E.D. Tenn. July 11, 2022).

[13]     During the hearing, the Court declined to rescind the AEO given that the parties had agreed that a small team employed by Plaintiffs could review the names of Wesley's current customers who were designated as AEO [Doc. 169 p. 111].

[14]     Notably, at the hearing the Court inquired whether Plaintiffs wanted to pursue sanctions in light of what had transpired [Doc. 169 pp. 113–15]. Plaintiffs had originally requested discovery on "Wesley's willful disregard of its AEO obligations" [Doc. 151 p. 4], but later withdrew that request [*See* Doc. 172].

24

forward, establishing misappropriation risks imposing too harsh a penalty, even relative to the conduct in this case"); *see also Dickenson v. Cardiac and Thoracic Surgery of Eastern Tenn.,* 388 F.3d 976, 983 (6th Cir. 2004) (a "sanction must be one that a reasonable jurist, apprised of all the circumstances, would have chosen as proportionate to the infraction"); *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 955 (N.D. Ill. 2021) ("Sanctions under Rule 37(b) must be proportionally tailored to the severity of the disobedient party's conduct."). *Snap-On Bus. Sols., Inc. v. Hyundai Motor Am.*, No. 5:07-CV-1961, 2011 WL 9925879, at *7 (N.D. Ohio June 8, 2011) (explaining that courts have "broad discretion in selecting a sanction that is proportionate to the particular discovery violations committed by party." (quoting *In re Connolly North America, LLC,* 376 B.R. 161, 181–82 (Bkrtcy. E.D. Mich. 2007)).

Plaintiffs assert that "[t]he minimum sanction, even if Wesley's actions were harmless (which they are decidedly not), is an award of attorneys' fees for this motion and the recent litigation regarding the AEO Order, as well as the other fees associated with Wesley's false designations" [Doc. 140 p. 10]. The Court agrees some attorneys' fees are warranted. While the Court finds Wesley's acts were negligent, sanctions are still warranted in light of the prejudice Plaintiffs experienced from Wesley's erroneous and untimely designations. *DR Distributors, LLC*, 513 F. Supp. 3d at 955 ("A violation of a court order does not need to be in bad faith; a negligent violation can trigger Rule 37(b) sanctions."). And Rule 37(b)(2)(C) provides, "Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

The Court does not find Wesley's actions to be substantially justified and does not find other circumstances exist to make an award of expenses unjust. As articulated above, conduct is "'substantially justified' if it raises an issue about which there is a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action." *Doe*, 407 F.3d at 766 (citing *Pierce*, 487 U.S. at 565). Here, Wesley acknowledged that it made mistakes. As noted above, in December 2022, Wesley erroneously de-designated 764 customers. This led to Plaintiffs' Second Motion for Sanctions [Doc. 139], a joint motion to continue [Doc. 145], the parties attending a telephonic motion hearing before Judge Corker [Docs. 146 & 149], Wesley's response to Plaintiffs' second motion [Doc. 150], and Plaintiffs' Emergency motion to stay and related filings [Docs. 151, 152, 156]. The Court finds that Plaintiffs are entitled to an award of their reasonable attorneys' fees for these above matters. In addition, the Court addressed these matters, in part, at the April 4 hearing, and therefore, the Court awards Plaintiffs half their time spent preparing for and attending the hearing. The Court finds an award of reasonable attorneys' fees will remediate the prejudice Plaintiffs incurred by Wesley's erroneous de-designations.[15]

The Court **ORDERS** the parties to meet and confer in an attempt to resolve the amount of attorneys' fees due under this Memorandum and Order. Should the parties not be able to agree,

---

[15]    Plaintiffs' motion seeks sanctions against Wesley and Defendant McDowell [*see* Doc. 140 p. 1], but they "fail[] to identify any conduct attributable to Mr. McDowell individually" [Doc. 150 p. 1]. The Court therefore declines to find Defendant McDowell liable for the sanctions. Further, at one point, Plaintiffs state that Wesley and its counsel violated the Court's Order [Doc. 140 p. 11]. Elsewhere in its brief, however, Plaintiffs request sanctions against Wesley [*Id*. at 1, 14]. And in their supplemental brief, Plaintiffs state, "While the Court has the authority to sanction both client and attorney, the Court may apportion costs as it deems fit, and [Plaintiffs are] ambivalent as to apportionment, so long as [they do] not suffer from Wesley's conduct" [Doc. 176 p. 7 n.3 (citation omitted)]. The Court declines to order Wesley's counsel to pay attorneys' fees in light of Herington and Whitaker's explanation of how the errors occurred [*See* Docs. 150-1 and 150-2].

Plaintiffs **SHALL** file proof in support of the requested attorneys' fees within **twenty-one (21) days** of this Memorandum and Order.

Finally, in their supplemental brief, Plaintiffs request that the undersigned "recommend that the pre-trial deadlines be extended for the three (3) months" Plaintiffs have "lost" [Doc. 176 p. 10]. But Judge Corker already extended the deadlines in this case [*see* Doc. 149] and at that time, the parties believed 764 customers had been erroneously designated when the actual number was 123. The Court declines to recommend that the pre-trial deadlines be extended for another three months. Should the parties desire an extension, they may file a motion requesting such or present any issues with the deadlines at the conference on December 4, 2023 [*See id.*].[16]

## V.        CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for Sanctions [**Docs. 116 and 139**].

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge

---

[16]        The Court has also reviewed the parties' supplemental briefs [Docs. 189 & 190] filed in August 2023. Plaintiffs filed a supplemental brief to notify the Court that in *Westgate Resorts, Ltd. v. Wesley Fin. Group, LLC*, No: 3:20-cv-599, the court found that "Wesley engaged in the unlicensed practice of law, and doing so violates the Tennessee Consumer Protection Act" [Doc. 189 p. 2]. But this decision does not relate to the discovery issues before the Court or a request for sanctions.

27