UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 3:20-CV-251-DCLC-DCP ) |
| WESLEY FINANCIAL GROUP, LLC, *et al.*, | ) ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Defendants' Motion to Compel Discovery and Incorporated Memorandum of Law in Support [Doc. 284].[1]  Plaintiffs have responded in opposition to the motion [Doc. 250].  Defendants have filed a reply [Doc. 254].  The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a).  For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** the motion [**Doc. 284**].

## I.    BACKGROUND

The Court has detailed the allegations in this case several times [Docs. 34, 62, 63, 106].  Plaintiffs market, sell, and manage vacation destinations throughout the world [Doc. 103 ¶ 1].  Plaintiffs allege that Defendant Wesley Financial Group, LLC ("Wesley") is an unregulated business whose sole purpose is to cancel another business's valid and enforceable contracts [*Id.* ¶

---

[1]    Defendants originally filed this motion under seal [*See* Doc. 232].  Later, at the Court's direction [*see* Doc. 276], Defendants filed a redacted version [Doc. 284].  The Court will cite to the redacted version.

2].  They claim that Defendant Wesley has made a business of and monetized the tort of tortious interference with contract and that it targets and disrupts valid contracts between timeshare developers and their customers [*Id.*].  Defendant Charles William McDowell ("Defendant McDowell") is Defendant Wesley's founder and Chief Executive Officer ("CEO") [*Id.* ¶ 4].

Based on the above, Plaintiffs allege false advertising under the Lanham Act, 15 U.S.C. § 1125(a), violations of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101, *et seq.*, and engagement in the unauthorized practice of law pursuant to Tennessee Code Annotated § 23-3-103 [*Id.* ¶¶ 82–130].

On January 12, 2024, the parties attended an informal discovery dispute conference with the Court [Doc. 218].  The parties presented several disputes, including Defendants' request for information regarding Plaintiffs' overall valuation process [Doc. 221 p. 2].  Following the conference, they reported a potential impasse on Defendants' request for Plaintiffs' financial records [*Id.*].  The Court ordered the parties to continue to meet and confer on these topics, and it continued the discovery dispute conference to January 22, 2024 [*Id.*].

During the January 22 discovery dispute conference:

> Plaintiffs announced that, to the extent there are any claims in the Second Amended Complaint for actual or compensatory damages, they are withdrawing their damages request. Instead, Plaintiffs assert that they are only pursuing their request for disgorgement under the Lanham Act and their request for declaratory relief and an injunction under the Lanham Act and the Tennessee Consumer Protection Act.

("Announcement") [*Id.* at 4].  Defendants stated that they needed time to consider how the Announcement affects their discovery requests [*Id.*].  The Court directed the parties to discuss the Announcement and whether it changes the scope of discovery [*Id.*].  Subsequently, the parties reported to Chambers that they had reached an impasse on this issue, and the Court granted the

parties leave to file motions.

On February 8, 2024, Defendants filed their Motion to Compel pursuant to Rule 37 of the Federal Rules of Civil Procedure and Local Rule 37.2 [Doc. 284]. Defendants seek an order "compel[ling] Plaintiffs to produce documents and information requested by Defendants' Fourth, Fifth, Sixth, and Ninth Request for Production of Documents ("RFP") [*Id*. at 1].[2] Many of the discovery requests at issue seek Plaintiffs' financial information [*See* Doc. 284-1]. Defendants contend that their discovery requests are relevant "for the proper application of the law to this case" [*Id*. at 16]. Defendants' argument is two-fold. "[First,] because the Lanham Act only provides relief for those who 'plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentation[,]'" Defendants argue, "Plaintiffs must prove an actual monetary harm even if they are only seeking disgorgement" [*Id*. at 4 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014)).

Second, Defendants argue that disgorgement cannot be used as a penalty, and therefore, "[t]he Court cannot make a determination as to whether an award of Defendants' profits would constitute compensation rather than a penalty if Plaintiffs refuse to produce discovery on the very issue that underpins their entire case" [*Id*. at 16–17]. And where "Plaintiffs claim the breach of their contracts is the basis of the harm[,]" Defendants state that Plaintiffs "must show more than just a breach, but also harm flowing from the breach" [*Id*. at 17]. In other words, "Defendants have sought the discovery . . . in order to ascertain whether any actual harm resulted from [Plaintiffs'] customers allegedly stopping payment" [*Id*. at 18]. In addition, Defendants state that

---

[2] The Court will refer to these RFPs as Fourth Set of RFPs, Fifth Set of RFPs, Sixth Set of RFPs, and Ninth Set of RFPs.

they "have sought additional documentation pertaining to [Plaintiffs'] securitization business" [*Id*. at 20]. The documents they seek "will explain what [Plaintiffs do] with originated loans in their ordinary course of business at the outset, but also in the event a loan enters default status" [*Id*. at 21]. Defendants argue that they need this information because they "believe that not only do these Plaintiffs not own the loans about which they complain now, [but that] they did not own the loans when they brought this lawsuit" [*Id*.]. Therefore, Defendants argue that Plaintiffs "cannot demonstrate harm under the Lanham Act[,] which is predicated on those loans entering default status" [*Id*. at 21]. Defendants also explain each discovery request in dispute, and they argue why the Court should compel Plaintiffs to respond [*Id*. at 6–15].

Plaintiffs generally deny that Defendants' discovery requests seek relevant information [Doc. 250]. According to Plaintiffs, "even if [they] profit[] from [their] continuing sales and other operations, [they] can still be harmed by Wesley's illegal conducted perpetrated against Diamond owners who contract with Wesley" [*Id*. at 5]. Considering its Announcement, Plaintiffs argue that they "must now only prove that [they have] been factually harmed, which is all that is required to prevail on each of its three (3) claims" [*Id*. at 6 (emphasis omitted)]. In other words, "quantification is not necessary" [*Id*. at 7]. Plaintiffs outline the specific harm caused by Defendants' alleged conduct [*Id*. at 8]. With respect to Defendants' argument that disgorgement cannot serve as a penalty, Plaintiffs state that their argument is contrary to the Lanham Act, 15 U.S.C. §§ 1117(a), which "makes clear that either an award of treble actual damages, or alternatively disgorgement of Wesley's profits cannot be punitive" [*Id*. at 11]. Plaintiffs conclude that their "financial loss does not figure in awarding disgorgement" [*Id*.]. Plaintiffs claim that Defendants are only seeking this discovery because they were able to discover Defendants' financial information [*Id*. at 13–15]. To the extent the Court finds such discovery relevant,

Plaintiffs argue that Defendants' motion should nevertheless be denied because they filed it too late in the discovery phase [*Id*. at 4]. Plaintiffs also explain their specific objections to the discovery requests [*Id*. at 15–25].

Defendants filed a reply, maintaining their position that "[u]nder the Lanham Act, an award of disgorgement must be compensatory, not punitive" [Doc. 254 p. 1]. Defendants further assert that Plaintiffs' response claims for the first time "additional monetary harms caused by [Defendants]" [*Id*. at 4]. In addition, the discovery of the securitization records are matters of standing and harm [*Id*. at 5]. And even though Plaintiffs are only seeking injunctive relief under the TCPA, Defendants argue that obtaining injunctive relief requires the movant to show an "ascertainable loss of money or property" [*Id*. at 9]. With respect to Plaintiffs' argument that the Court should deny Defendants' attempt to engage in last-minute discovery, Defendants argue that they served these discovery requests months ago [*Id*. at 10].

## II.     STANDARD OF REVIEW

The parties' dispute is governed under Rule 26 of the Federal Rules of Civil Procedure. Rule 26 provides as follows:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Courts have explained that the "scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad." *Meredith v. United Collection Bureau, Inc.*, 319 F.R.D. 240, 242 (N.D. Ohio 2017) (quoting *Lewis v. ACB Bus. Serv., Inc.*, 135 F.3d 389, 402 (6th Cir.

1998)). Courts have cautioned, however, that "[d]iscovery requests are not limitless, and parties must be prohibited from taking 'fishing expeditions' in hopes of developing meritorious claims." *Bentley v. Paul B. Hall Reg'l Med. Ctr.*, No. 7:15-CV-97-ART-EBA, 2016 WL 7976040, at *1 (E.D. Ky. Apr. 14, 2016). "[T]he [C]ourt retains the final discretion to determine whether a discovery request is broad or oppressive." *Id.* (citing *Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007)).

With respect to proportionality, "there is now a specific duty for the court and the parties to consider discovery in the light of its 'proportionality to the needs of the case[.]'" *Turner v. Chrysler Grp. LLC*, No. 3:14-1747, 2016 WL 323748, at *1 (M.D. Tenn. Jan. 27, 2016) (citation omitted). "Instead of facilitating costly and delay-inducing efforts to look under every stone in an e-discovery world populated by many stones, the new rule 'crystalizes the concept of reasonable limits on discovery through increased reliance on the common-sense concept of proportionality.'" *Helena Agri-Enters., LLC v. Great Lakes Grain, LLC*, 988 F.3d 260, 273 (6th Cir. 2021) (quoting John G. Roberts, Jr., 2015 Year-End Report on the Federal Judiciary 6 (2015)).

The movant bears the burden of showing that the discovery requests are relevant to the issues in the case. *In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-CV-01112, 2020 WL 6750397, at *2 (M.D. Tenn. Nov. 16, 2020) (citation omitted). "If relevancy is shown, the party resisting discovery bears the burden of demonstrating why the request is unduly burdensome or otherwise not discoverable under the Federal Rules." *Id.* (quoting *United States v. Carell*, No. 3:09-0445, 2011 WL 2078023, at *2 (M.D. Tenn. May 26, 2011)).

III.    ANALYSIS

The Court finds that Defendants' motion is timely and will consider the merits of this matter. The Court further finds that Plaintiffs shall respond to RFP Nos. 11, 16, and 27 in the Sixth

6

Set of RFPs. The parties shall meet and confer regarding RFP Nos. 14 and 15 in the Sixth Set of RFPs. The Court declines to order Plaintiffs to respond to any other discovery requests that are subject to this motion.

### A.     Defendants' Motion is Timely

Before considering the merits, the Court will address Plaintiffs' argument that the Court should deny Defendants' motion because they filed it late in the discovery stage [Doc. 250 p. 25]. Plaintiffs claim that Defendants now seek discovery that they have "objected to and declined to produce for over three (3) years" [*Id*. at 2]. Defendants respond that "[t]he record plainly establishes" that their "discovery requests were timely served months before the discovery cutoff and are plainly relevant" [Doc. 254 p. 10]. Despite their obligation to respond, Defendants argue that Plaintiffs have not done so [*Id*.]. Defendants point to Plaintiffs' recent discovery efforts to argue that they "are engaging in an 'avalanche' of last-minute discovery" [*Id*. at 10–11].

The parties do not explain when Defendants served the Fourth, Fifth, and Ninth Set of RFPs or when Plaintiffs responded. According to Plaintiffs, Defendants served their Sixth Set of RFPs on December 22, 2023 [Doc. 250 p. 14].[3] Although the Court does not have specific dates for when Defendants served and Plaintiffs responded to many of these discovery requests, the discovery deadline in this case expires on March 29, 2024 [*See* Doc. 181]. Defendants filed their motion on February 8, 2024 [Doc. 232]. And notably, they brought some of these matters to the Court's attention in January 2024, meaning that the parties had approximately two months to finish discovery. While Defendants should have brought some of these issues to the Court's attention

---

[3]     Plaintiffs noted in response to Defendants' expedited motion to stay discovery that they had "opposed production of the financial data Wesley is seeking since its response to Wesley's first set of requests for production, which [they] responded to on January 15, 2021" [Doc. 227 p. 14]. Any issues regarding the First Set of RFPs, however, are not before the Court.

7

more promptly, the undersigned does not find it to be appropriate to deny the motion solely based on its timing under these circumstances. *Cf. Pittman v. Experian Info. Sols., Inc.,* 901 F.3d 619, 642 (6th Cir. 2018) ("A district court may properly deny a motion to compel discovery where the motion to compel was filed after the close of discovery." (quoting *Willis v. New World Van Lines, Inc.*, 123 F. Supp. 2d 380, 401 (E.D. Mich. 2000)); *see also Cont'l Cas. Co. v. Tyson Foods, Inc.,* No. 1:15-CV-20-HSM-SKL, 2017 WL 11180629, at *2 (E.D. Tenn. June 15, 2017) ("Many courts have found that motions seeking court intervention in discovery disputes after the close of discovery are untimely absent special or extreme circumstances." (citation omitted)).[4] The Court will therefore consider the merits of Defendants' request.

## B. Defendants' Request for Production of Documents

The primary dispute between the parties is whether the information Defendants seek is relevant to the issues in this case. As mentioned above, Defendants argue that because the Lanham Act provides relief for those who have sustained "an injury to a commercial interest[,]" then "Plaintiffs must prove an actual monetary harm even if they are only seeking disgorgement" [Doc 284 p. 4 (citation omitted)]. Second, Defendants argue that an award under the Lanham Act cannot constitute a penalty, and therefore the Court must consider Plaintiffs' financial harm [*Id.* at 16–17]. According to Defendants, "[o]ther than the monetary harm allegedly incurred due to non-

---

[4] The cases that Plaintiffs rely on are distinguishable. *Cf. O'Donnell v. Genzyme Corp.*, 640 F. App'x 468, 476 (6th Cir. 2016) (noting that the plaintiff brought the issue to the court's attention less than three weeks from the initial discovery deadline); *Harry A. v. Duncan*, 223 F.R.D. 536, 538 (D. Mont. 2004) (granting in part the defendants' request for a protective order when plaintiffs noticed 85 depositions from July 20 to August 2, noting that some of the depositions were set for the same time slots), *supplemented by* 330 F. Supp. 2d 1133 (D. Mont. 2004); *Ridge Chrysler Jeep L.L.C. v. Daimler Chrysler Servs. N. Am., L.L.C.*, No. 03 C 760, 2004 WL 3021842, at *4 (N.D. Ill. Dec. 30, 2004) (finding that the "[p]laintiffs' [m]otion [t]o [c]ompel is a clear case of too little, too late" because they filed it four days before the close of discovery and failed to meet and confer prior to filing it).

payment, there is no harm alleged in this case that is cognizable under the Lanham Act" [*Id*. at 17]. In addition, because Plaintiffs allege that the breach of the contract under the Lanham Act is the harm, they must show the "harm flowing from the breach" [*Id*. at 17 (citations omitted)]. Defendants believe that Plaintiffs have not been financially harmed [*id*. at 18–19] and state that Plaintiffs may even profit from the conduct alleged in the Amended Complaint [Doc. 254 pp. 8–9]. Further, under the TCPA, Defendants state that Plaintiffs must demonstrate an "ascertainable loss of money or property" [*Id*. at 9 (quoting Tenn. Code Ann. § 47-18-109(a)(1)].

Plaintiffs generally deny that the information sought is relevant, explaining that they are no longer seeking actual or compensatory damages, and instead, are only pursuing their request for disgorgement under the Lanham Act and injunctive relief under the Lanham Act and the TCPA. Plaintiffs deny that they must show that they have been harmed monetarily—instead, they "must now only prove that [they have] been factually harmed" [Doc. 250 p. 6]. Similarly, under the TCPA and their claim under Tennessee Code Annotated § 23-3-112(a)(1), Plaintiffs argue they must "only prove that [they have] suffered some form of factual loss" [*Id*. at 7]. And here, Plaintiffs state that they have been harmed as follows:

- lost thousands of members,
- lost the ability to communicate with its own members,
- incurred costs associated with recovering defaulted interests,
- incurred carrying costs (e.g.[,] maintenance fees) prior to sale,
- incurred marketing and sales costs associated with selling its inventory of timeshare interests,
- lost the ability to monetize, through the debt offerings (which Diamond must repay), Plaintiffs' newly originated notes substituted for Wesley induced defaulted notes, and lost the ability to sell timeshare interests or *other* inventory to members for sales that would be *additive* rather than simply returning to even making up for the members Wesley caused Diamond to lose.

[*Id*. at 8 (emphasis and footnote omitted)].

9

In order to establish a claim for false advertising under the Lanham Act, the plaintiff must establish that the defendant "(1) made false or misleading statements of fact about [its] products, (2) which actually deceived or had a tendency to deceive a substantial portion of the intended audience, and (3) likely influenced the deceived consumers' purchasing decisions." *Wysong Corp. v. APN, Inc. (17-1975)*, 889 F.3d 267, 270 (6th Cir. 2018). A prevailing party is entitled to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) costs of the action." 15 U.S.C. § 1117. "Disgorgement of profits 'is appropriate where: (1) the defendant's conduct was willful and deliberate, (2) the defendant was unjustly enriched, or (3) it is necessary to deter future conduct.'" *Bluegreen Vacations Unlimited, Inc. v. Timeshare Laws. P.A.*, No. 20-24681-CIV, 2023 WL 7109914, at *26 (S.D. Fla. Oct. 27, 2023) (quoting *Optimum Techs., Inc. v. Home Depot U.S.A., Inc.*, 217 F. App'x 899, 902 (11th Cir. 2007)).

With respect to disgorgement, "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claim" [*Id.*]. When a plaintiff seeks disgorgement, it "shifts the burden of proving economic injury off the innocent party, and places the hardship of disproving economic gain onto the infringer." *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1353 (11th Cir. 2019). "Disgorgement, an equitable remedy, targets the wrongdoer and seeks to deter improper conduct and prevent unjust enrichment." *Watkins Inc. v. McCormick & Co., Inc.*, 574 F. Supp. 3d 644, 656 (D. Minn. 2021); *see also Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 607 (6th Cir. 1991) ("Profits are awarded under different rationales including unjust enrichment, deterrence, and compensation." (quoting *Roulo v. Russ Berrie & Co.,* 886 F.2d 931, 941 (7th Cir. 1989)).

"The remedies provided for in 15 U.S.C. § 1117(a) are 'subject to the principles of equity[.]" *Bluegreen Vacations Unlimited, Inc.*, 2023 WL 7109914, at *26 (citation omitted). As

10

noted by the United States Court of Appeals for the Sixth Circuit, "[T]he Lanham Act gives little guidance on the equitable principles to be applied by a court in making an award of damages[.]" *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 343 (6th Cir. 2010) (quoting *Synergistic Int'l, LLC v. Korman,* 470 F.3d 162, 174 (4th Cir. 2006)). Given that, "the courts have weighed the equities of disputes on a case-by-case basis, considering a wide range of factors[.]" *Id.*

The Lanham Act provides, however, that "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a). The Sixth Circuit has stated, "if the sum exacted is greatly disproportionate to the actual loss, it constitutes a penalty rather than damages." *La Quinta Corp.*, 603 F.3d at 343 (emphasis omitted) (quoting *Bowles v. Farmers Nat'l Bank of Lebanon,* 147 F.2d 425, 428 (6th Cir. 1945)); *see also Bluegreen Vacations Unlimited, Inc.*, 2023 WL 7109914, at *27 ("In other words, disgorgement 'should not produce. . . a gross disconnect between harm and recovery.'" (quoting *KEG Techs., Inc. v. Laimer*, 436 F. Supp. 2d 1364, 1373 (N.D. Ga. 2006)); *see also Innovation Ventures, LLC v. N2G Distrib., Inc.*, No. 08-CV-10983, 2012 WL 1468470, at *4 (E.D. Mich. Apr. 27, 2012) (finding that because the plaintiff did not suffer any loss of business due to the defendant's infringement, the plaintiff was not entitled to treble damages as such would constitute a penalty).

Under the TCPA, "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages." Tenn.

11

Code Ann. § 47-18-109(a)(1). "In order to recover under the TCPA, the plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated[.]'" *Campbell v. Teague,* No. W2009–00529–COA–R3–CV, 2010 WL 1240732, at *6 (Tenn. Ct. App. Mar. 31, 2010) (quoting Tenn. Code Ann. § 47–18–109(a)(1)); *see also Legens v. Lecornu*, No. W2013-01800-COA-R3CV, 2014 WL 2922358, at *16 (Tenn. Ct. App. June 26, 2014) (stating the same). "A loss is ascertainable if it is measurable, even if the precise amount of the loss is unknown." *Discover Bank v. Morgan,* 363 S.W.3d 479, 496 (Tenn. 2012) (internal quotation marks omitted). Such losses include "out-of-pocket or a loss of value." *Id*. (internal quotation marks omitted); *see also Taylor v. Thomas*, 624 F. App'x 322, 327 (6th Cir. 2015) (finding that a "[a] service mark, and its associated goodwill" constitutes "'an ascertainable loss' of a 'thing of value'" (citation omitted).[5]

Neither the Lanham Act nor the TCPA appears to require Plaintiffs to quantify their monetary harm given they have elected to seek injunctive relief and disgorgement. *See Lexmark Int'l, Inc.*, 572 U.S. at 135–36 ("Even when a plaintiff cannot quantify its losses with sufficient certainty to recover damages, it may still be entitled to injunctive relief . . . or disgorgement"); *Bluegreen Vacations Unlimited, Inc.*, 2023 WL 7109914, at *26 ("Bluegreen is injured by the false statements because the false statements convince owners that hiring Marketing Defendants will result in a successful exit and advertise to owners the ability to stop their payments, without harm

---

[5] Plaintiffs also claim that Defendants engaged in the unauthorized practice of law. *See* Tenn. Code Ann. § 23-3-112(a)(1) ("[a]ny person who suffers a loss of money or property, real, personal or mixed, or any other article, commodity or thing of value wherever situated, as a result of [unlicensed practice of law], may bring an action . . . and may be afforded such other relief as the court considers necessary and proper").

12

to their credit, and with legal assistance. The cumulative effect of the false statements is that Bluegreen owners sign up with the Marketing Defendants and, pursuant to these statements, stop making their payments."); *Westgate Resorts, Ltd. v. Wesley Fin. Grp., LLC*, No. 3:20-CV-00599, 2023 WL 5062065, at *19 (M.D. Tenn. Aug. 8, 2023) (entering summary judgment on the plaintiffs' TPCA claim because "Wesley engaged, and apparently continues to engage, in the unauthorized practice of law, and the manner in which it does so constitutes a deceptive practice in violation of the TCPA, insofar as it has led and tends to lead its customers—and Westgate's owners—to believe that Wesley's system for cancelling timeshares is based on some legitimate legal grounds. Moreover, Westgate suffers injury resulting from Wesley's deceptive acts, insofar as Wesley's practice of representing its services as somehow "legal" in nature induces people to stop paying mortgages to Westgate").

But to the extent Plaintiffs are awarded disgorgement, Defendants would like to show that Plaintiffs have not been financially harmed and instead have profited therefrom. Defendants further argue that Plaintiffs have not forgone all relevant inquiries into their financial information by pursuing only disgorgement and injunctive relief given that some of the harm that they allege are deemed "costs." The Court therefore finds some limited discovery of Plaintiffs' financial information may be warranted. The Court, however, will turn to the specific discovery requests at issue to determine if they seek relevant information that is proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b).

### 1. Fourth Set of RFP Nos. 5, 6, and 8

The parties dispute RFP No. 5, which states:

> RFP No. 5. With respect to each timeshare interest that has been
> identified during discovery in this case that has been cancelled or
> terminated by Diamond, produce all documents, records, notations,
> emails, communications, and ESI which relate to, refer to, and/or

confirm each instance in which any value of the timeshare interest has been or is noted, stated, assigned and/or recorded on or in any document or record (electronic or otherwise) or in any database used by or on behalf of Diamond or by or on behalf of any related entity or agent of Diamond, regardless of whether any such value was actual, estimated, assumed, or otherwise and regardless of whether any such value was for internal use only or was utilized for any other purpose and/or was communicated to any third party, including but not limited to any such value noted, stated, assigned and/or recorded: (a) as of the date the timeshare interest was purchased; (b) on the date the timeshare interest was terminated or cancelled; (c) at any time during any fiscal or calendar year between the purchase and the cancellation or termination of the timeshare interest; and (d) at any time after the cancellation or termination of the timeshare interest.

[Doc. 284-1 pp. 2–3]. In their response to this discovery request, Plaintiffs stated that they do not ascribe a value to the customers' timeshare interests, but they ascribe a purchase price, which Plaintiffs interpret to mean "the 'value' information Wesley seeks" [*Id*. at 3–4]. Plaintiffs further stated that they will produce documents that identify the purchase price and will also produce the 1099-Cs for "customers' timeshares that were terminated for non-payment after retaining Wesley" [*Id*. at 4].

As explained by Defendants, this RFP seeks "documents regarding any such value as of the date of the timeshare was purchased, when it was cancelled or terminated, at any time between purchase and cancellation, and at any time after cancelation or termination" [Doc. 284 p. 6]. The value given, Defendants assert, is relevant to show whether Plaintiffs suffered any harm or profited by recovering a defaulted timeshare interest [*Id*.].

Even assuming this RFP is relevant, Plaintiffs respond that this RFP "requested a veritable word salad associated with internal accounting of 'values' of members' timeshare interests" and that Plaintiffs have "responded that recovered defaulted member inventory is generally not reflected on the balance sheet in any meaningful way" [Do. 250 p. 16]. Plaintiffs state that

14

Defendant Wesley cannot "compel [the] production of documents that do not exist or have no bearing on the case" [*Id.*].

Considering their representation that they do not ascribe a value to customers' timeshare interests, the Court finds that Plaintiffs have sufficiently responded to this discovery request by producing documents relating to the purchase price. *In re Porsche Cars N. Am., Inc.*, No. 2:11-MD-2233, 2012 WL 4361430, at *10 (S.D. Ohio Sept. 25, 2012) ("[A] party responding to a Rule 34 request is not obligated to create new documents." (citation omitted)).

The parties dispute RFP No. 6, which states:

> RFP No. 6. With respect to the Diamond timeshare ownership interests and/or membership points generally referenced throughout Plaintiffs' Second Amended Complaint, produce all documents, records, notations, emails, communications, and ESI which relate to, refer to, and/or confirm the type (i.e. categories of membership points and/or types of ownership interests) and the total of all such ownership interests which were booked, issued for sale, available for sale, in inventory, and/or in existence for each fiscal year from January l, 2018, to the present.

[Doc. 284-1 p. 4]. In response, Plaintiffs explain that the points are "entirely fungible" and that there is not a "variation between any one point and another one that [they] sell[]" [*Id.*]. They provided a chart for each calendar year for the number of points that were registered and that were unsold [*Id.* at 5].

According to Defendants, "[W]hat remains is for [Plaintiffs] to produce documents and information which relate to how [they] account[] for points in inventory—not merely the number of points, but the value ascribed to those points on the books" [Doc. 284 p. 7]. In opposition to the motion, Plaintiffs assert that the RFP does not request any information about value.

The Court agrees with Plaintiffs and finds that Defendants' request for the "value ascribed to those points on the books" is not within the scope of this RFP. The Court declines to order

Plaintiffs to supplement their response to this discovery request.

The parties dispute RFP No. 8, which states:

> RFP No. 8. With respect to the timeshare interests which you contend were foreclosed upon or otherwise cancelled or terminated as a result of any conduct of Wesley's, produce documents, records, notations, emails, communications, and ESI sufficient to show whether each such timeshare interest was resold, taken back into inventory, booked as a loss or credit, and/or otherwise noted or documented on any business record of Diamond's and/or any of Diamond's agents and/or related parties.

[Doc. 284-1 pp. 5–6]. Among many objections, Plaintiffs asserted that they "understand this request to seek documentation regarding Diamond's recovery of inventory associated with Wesley's customers" [*Id*. at 6]. They responded "that upon termination, the points associated with terminated timeshare membership interests are returned to the cumulative register of the appropriate developer entity" [*Id*.]. "The points[,]" Plaintiffs claimed, "are entirely fungible" [*Id*.]. Plaintiffs stated that "[t]here is no way to identify one point from another, and upon termination, there is no way to track any given point once owned by a Wesley customer. Such interests are not, and are in capable of being, 'resold'" [*Id*.]. They therefore conclude that "there are no documents responsive to this request" [*Id*.].

Defendants assert that this RFP is "relevant to whether Diamond sustained any harm when the customers breached their contracts and [Plaintiffs] subsequently recovered their timeshare interests" [Doc. 284 p. 8]. "Without seeking [Plaintiffs'] information as to how [they] account for recovered collateral," Defendants assert that "it is hard to say what discovery could reveal or what kind of documents would be produced" [*Id*.]. "[They] expect that [Plaintiffs] would be accounting to the debtor for potential deficiencies or surpluses or otherwise complying with the Uniform Commercial Code" [*Id*. (citation omitted)].

Plaintiffs respond that they have "produced (or are in the process of producing)

16

documentation that shows what happened to each member's membership (and related points) through the point of termination" [Doc. 250 p. 17]. Plaintiffs explain that their points are "fungible, and after being returned to [their] inventory, [they] are incapable of tracking such that any point can ever be said to be 'resold'" [*Id*.]. Although Defendants reference the Uniform Commercial Code, Plaintiffs argue that they have no standing to argue that and have not used it as a defense [*Id*.]. Regardless, Plaintiffs contend, that they do "not account for the 'value' of points at the time of termination, and cannot do so post-termination" [*Id*.]. Plaintiffs submit that Defendants "cannot compel [them] to produce documents that just do not exist" [*Id*.].

Here, Plaintiffs have agreed to produce documents that show what happened to each member's points through termination. They have also explained that afterwards, the points are placed in a cumulative inventory, and there is no further tracking. In light of Plaintiffs' representations, the Court finds that they have adequately responded to this discovery request. *In re Porsche Cars N. Am., Inc.*, 2012 WL 4361430, at *10 (explaining that there is no obligation to create documents).

### 2. Fifth Set of RFPs No. 1

The parties present only dispute one RFP subject to this set of document requests. Specifically, RFP No. 1 seeks:

> RFP No. 1. Documents related to the securitization of any loan note or notes associated with any owner contract or contracts that are at issue in this case, or that are related to any claim for relief sought by you, including: (a) All Rating Agencies Pre-Sale Reports; (b) All Rating Agency Surveillance Reports; (c) Documents containing the listing of loan notes associated with each securitization transaction (Portfolio Holdings Report); (d) All Monthly Trustee Reports; (e) All Monthly Servicer Reports; (f) All Collection Reports; (g) All Annual Accountants Reports; (h) Documents reflecting the default rate of each securitization pool; (i) Documents reflecting all variables impacting the rate of return for each securitization pool; and (j) Documents reflecting all variables impacting the value of any

17

"residual" interest.

[Doc. 284-1 pp. 7–8]. Plaintiffs responded with many objections, including that the request seeks irrelevant information and that it is overly broad [*Id.* at 8–9].

Defendants assert that Plaintiffs produced "indenture agreements and information pertaining to the pledging of loans" [Doc. 284 p. 10]. But Defendants state that Plaintiffs have not produced (1) documents sufficient to show what, if any, monetary benefit remains with any Diamond entity once a loan is securitized, (2) all the monthly servicing reports associated with the loans at issue in this case, (3) copies of the alonges to the notes showing how the loans changed hands, or (4) any documentation regarding which Diamond entity recovers ownership or possession of the notes in the event of a default or any documents showing the effectuation of that transfer" [*Id.*].[6] Defendants maintain that "[i]f indeed every loan originated by one of the Plaintiff Collection entities in this lawsuit immediately transfers that loan either to be securitized or to be used as collateral for lines of credit, then these Plaintiffs simply have no standing to complain if a transferred loan goes into default status" [*Id.* at 20-21].

Plaintiffs respond that the scope of the RFP does not include the information subject to Category Nos. 1, 3 and 4 [Doc. 250 p. 18]. With respect to Category No. 2, Plaintiffs submit that "these monthly servicer reports identify the 'waterfall' of payments that are made to various investors (or Diamond), and the number (and associated dollar amounts) of substitutions and repurchases [Plaintiffs] performed as a result of the owner defaults" [*Id.* at 19]. According to Plaintiffs, these reports do not provide details regarding any specific loan, but "summarize the activities of thousands of loans" [*Id.*]. Plaintiffs argue that Defendants have not shown how the monthly servicing reports are relevant to this case [*Id.*]. "For every securitization that a Wesley

---

[6]         The Court will refer to these four requests as "categories."

18

customer's loan was ever pledged to," Plaintiffs state that they "produced the final (or most recent) servicer report, which is cumulative of all prior monthly service reports for a given securitization" [*Id*.]. Plaintiffs state that "[b]reaking the data down into monthly slices will provide no more relevant information than the final report" [*Id.*].

With respect to allonges, although Plaintiffs state that Category No. 3 is not within the scope of this request, they argue that they have produced documents that relate to [Defendant] Wesley customers" [*Id*. at 20]. Plaintiffs argue that "[f]or each securitization that a [Defendant] Wesley customer's loan was pledged to, [Plaintiffs have] produced a copy of the form allonges that trace the pledged loans from the originator all the way to the entity that ultimately securitizes the loans" [*Id*.]. They contend that Defendants have not established why they need more information. In a similar vein, Plaintiffs state that Category No. 4 is not within the scope of this discovery request, but regardless, they "produced representative samples of the so-called 'Return' documents which are the only contractual source of this information" [*Id*.].

With respect to Defendants' argument about standing, Plaintiffs respond that it has "been rejected by every court that has addressed such an argument" [*Id*. at 21]. But even if Defendants were correct, Plaintiffs contend that it would "not justify the discovery [Defendants] seek[] because . . . [Plaintiffs are] not seeking a judgment for money damages, as to the Wesley induced defaulted notes or otherwise" [*Id*.].

Defendants reply that this RFP seeks information relating to standing and Plaintiffs' harm [Doc. 254 p. 5]. "Although Plaintiffs have produced some securitization documents," Defendants argue that "they do not answer the ownership question" [*Id*.]. Instead, Defendants state that Plaintiffs "produced indentures for the securitization offerings, but the Plaintiffs are not parties to the indenture" [*Id*.]. According to Defendants, "[f]rom the documents produced to date, it appears

that, by the time a loan originated by a Plaintiff is subject to an indenture, it has been sold to several different Diamond entities [*Id*.]. Defendants state that the indentures do not "show whether a defaulted loan ever came back to one of the Plaintiffs" [*Id*.]. "Plaintiffs have produced charts or lists of certain loans that were used in securitization transactions," but Defendants argue that "the charts do not show to which Diamond entity the loans were returned" [*Id*. at 5]. Relying on its expert's declaration, Defendants assert such information is relevant [*Id*. at 6 (citing Doc. 254-1)]. Defendants maintain that "[i]f Plaintiffs have no legal rights under the loans at issue[,] then they have no legal right to sue for harm predicated on those loans default" [*Id*.].

The Court notes that Defendants do not respond to Plaintiffs' argument that the information in Category Nos. 1, 3, and 4 are not within the scope of RFP No. 1. On its face, and without explanation from Defendants, the Court finds that the documents Defendants seek in Category Nos. 1, 3, and 4 do not appear to be included within the scope of RFP No. 1. The Court will therefore not require Plaintiffs to supplement their responses on this basis.

Defendants also seek "all monthly service reports for each loan at issue" [Doc. 284 p. 10]. Although this category is within the scope of this discovery request, Defendants do not sufficiently explain why they need these documents or why Plaintiffs' prior production is insufficient. According to Plaintiffs, the monthly servicer reports "summarize the activities of thousands of loans[,]" and Plaintiffs produced the final servicer report, "which is cumulative of all prior monthly servicer reports for a given securitization" [Doc. 250 p. 19]. *See* Fed. R. Civ. P. 26(b)(2) (explaining that the court must limit discovery when it is "unreasonably cumulative or duplicative"). The Court finds Defendants' arguments not well taken.

**3.    Sixth Set of RFPs Nos. 4, 6, 8, 9, 11, 14, 15, 16, and 27**

The Sixth Set of RFPs relate to Defendants' request for Plaintiffs' financial information.

20

Specifically, RFP Nos. 4, 6, 8, and 9 state:

> RFP. No. 4 Produce Your Detailed Financial Statements, by account, for 2016 through the present.
>
> RFP No. 6. Produce Your Annual Revenue Reports, by client, for each year from 2015 through the present.
>
> RFP No. 8. Produce Your Income Statements from 2015 through the present.
>
> RFP No. 9. Produce Your Statements of Cash Flows from 2015 through the present.

[Doc. 284-1 pp. 11–15]. Plaintiffs responded with several objections, including that the requests were not relevant or proportional to the needs of the case and not limited to the relevant time period [*Id.*].

Defendants argue these RFPs seek information relevant to determine whether Plaintiffs suffered any financial harm as a result of Defendants' alleged conduct. Although Plaintiffs are only seeking disgorgement, Defendants argue that Plaintiffs "must show that [they] suffered a harm that is not disproportionate to the $52 million that [they] seek[] to recover from [Defendants]" [Doc. 284 p. 11]. In addition, the documents requested in these RFPs "would reveal that [Plaintiffs] transfer[] un-securitized loans to a non-Plaintiff entity for purposes of obtaining collateral back lines of credit which, again, shows the disconnect between the non-payment issue and these Plaintiffs' claims" [*Id.*].

Plaintiffs claim that their "individualized financials are . . . maintained . . . on a consolidated basis in accordance with GAAP" [Doc. 250 p. 22]. According to Plaintiffs, "[Defendant] Wesley has insisted [that] the discovery in this case is limited to Wesley's customers" [*Id.*]. Plaintiffs state that "[t]he first category of documents [Defendant] Wesley requests—detailed financial statements, annual revenue reports, income statements, and statements of cash flows—. . . reflect

21

the activity of hundreds of thousands of members, only a small number of which are Wesley customers" [*Id*. at 22]. Plaintiffs assert that "[t]hese documents could never reflect any data that is meaningful to the present case, and Wesley's expert report does not claim that those documents would" [*Id*.]. Plaintiffs maintain that their financial information is not relevant considering the remedies they seek in this case [*Id*. at 5–13].

Defendants reply that according to their expert, Joseph Spinella, Jr., ("Mr. Spinella"), "Plaintiffs' financial and accounting records are important to review for the purpose of analyzing whether any Plaintiff suffered any monetary harm as a result of the conduct alleged" [Doc. 233-1 ¶ 7]. Mr. Spinella states:

> 12. Further, I am advised that the developer Plaintiffs depend on recaptured / recovered points for a significant part of their annual income. In other words, in many years, if not in all years, more net profit is generated by the sale of recaptured / recovered points than by the sale of points in existing inventory. Accordingly, it would be important to review and analyze the financial and accounting records pertaining to those issues, as well as those financial and accounting records pertaining to the value and/or equity in any recaptured or recovered points which is retained by the developer Plaintiff and not paid back to customers after cancellation or default, to determine whether, in fact, the recovery of points is a financial benefit to Plaintiffs (and, potentially, a significant financial benefit) rather than something that results in monetary harm.

> 13. Plaintiffs would presumably have some costs of sale as points are recovered and resold. Based on the filings during time periods when Diamond was publicly traded and post-acquisition by Hilton Grand Vacations, Inc., those costs of sale are significantly exceeded by the gross revenues received when points are sold. In other words, it appears that the overhead and commissions that Diamond has in its sales process has been in place and that Diamond depends on its ability to have and to recover a significant amount of points to sell during any given year as a means of generating significant profits each year.

> 14. For similar reasons, the financial and accounting records referenced above should reflect the extent to which any such harm, if found or assumed, is more than a technical or de minimis amount

or is an amount that is significantly less than the amount of disgorgement being claimed by Plaintiffs.

15. Sales figures and related data for all of Plaintiffs' points sales – the financial and accounting records for the time period at issue -- are important to review and analyze in this case because, as Diamond evidently has asserted, Diamond points are fungible.

16. In summary, Plaintiffs' financial and accounting records and those of their related entities, pertaining to the transactions involving the customers at issue and the related notes, as well as the sales figures and related data generally, are highly likely to reflect and confirm the extent to which Diamond suffered any harm in connection with the cancellation of the timeshare interests (points) for the customers at issue in this case.

[*Id*. ¶¶ 13–16].

After considering the parties' arguments and evidence, the Court finds that Defendants have not established that the above requests seek relevant information that is proportional to the needs of the case. This case involves only a portion of Plaintiffs' business—Defendant Wesley's customers. Plaintiffs' company-wide information is not relevant to the issues in this case, and the information Defendants seek "reflect the activity of hundreds of thousands of members" [Doc. 250 p. 22]. Notably, as Plaintiffs acknowledge, they maintain their financial information on a consolidated basis. Even so, the relevant inquiries should be narrowly tailored to Defendant Wesley's customers. In addition, the Court finds that such broad discovery requests are also not relevant to whether an award of disgorgement, if any, would constitute a penalty. The relevant inquires on this issue do not involve Plaintiffs' overall financial health. Instead, these inquiries should be tailored to the specific defaults allegedly caused by Defendant Wesley, and from those defaults, to whether Plaintiffs actually made a profit. And Defendants' experts' report/declarations do not convince the undersigned otherwise as they do not sufficiently explain how company-wide financial information is relevant to these narrow inquiries. The Court therefore declines to order

Plaintiffs to respond to these discovery requests.

The parties dispute RFP No. 11:

> RFP No. 11. Produce documents sufficient to identify any portion of bad debt identified on Your income statements that is attributable to Diamond timeshare owners that have been identified during discovery in this case as having their timeshare interest cancelled or terminated.

[Doc. 284-1 p. 16]. Plaintiffs responded with many objections, including that the request is overly broad and vague and not limited to the relevant time period [*Id.* at 16–18].

Defendants state that this request seeks information "relevant to whether [Plaintiffs] sustained any financial harm as a result of Wesley customers' defaulting on their loans, and [Defendants'] subsequent recovery of their terminated timeshare interests" [Doc. 284 p. 11].

Plaintiffs respond that Defendants attached their (Diamond's) last 10-K, but that document does not show any bad debt [Doc. 250 p. 22]. They argue that "[Defendants] avoid[] explaining what such data could ever be used for" [*Id.*].

In light of the narrow scope of this discovery request, and Defendants' claim that Plaintiffs profited from Defendants' alleged actions, the Court overrules Plaintiffs' objection to this discovery request. Plaintiffs **SHALL** respond to RFP No. 11 within **ten (10) days**.

The parties dispute RFP Nos. 14 and 15, which state:

> RFP No. 14 Produce documents sufficient to identify all commissions paid to Your employees, on an annual basis, related to sales to Diamond timeshare owners that have been identified during discovery in this case as having their timeshare interest cancelled or terminated.
>
> RFP No. 15. Produce documents sufficient to identify all bonuses paid to Your Employees, on an annual basis, related to sales to Diamond timeshare owners that have been identified during discovery in this case as having their timeshare interest cancelled or terminated.

24

[Doc. 284-1 pp. 19, 21]. In response, Plaintiffs made several objections, including that the requests were overly broad, vague, and seek irrelevant information not limited to the relevant time period [*Id*. at 19–22].

According to Defendants, Plaintiffs "may claim that some portion of its harm is the result of resale of recovered points and the commissions paid to employees who resell the points is part of the cost of resale" [Doc. 284 p. 11]. Defendants state that "[i]f [they] do not have access to this information, they cannot rebut such assertions with evidence that, notwithstanding the costs of resale, Diamond profits from the resale far in excess of its expected revenue from the prior loan" [*Id*. at 12].

Plaintiffs respond that this discovery request seeks "the commissions [Plaintiffs] paid to its employees associated with selling timeshare interests—not just Wesley customers but all customers" [Doc. 250 p. 22 (emphasis omitted)]. Plaintiffs explain that they have told Defendants "the range of out-of-pocket expenses, including sales commissions, that [they] pay[] to sell a timeshare" [*Id*.]. Plaintiffs argue that they have also told Defendants "that those sunk costs—and the unpaid sunk costs of the prior sale for which Wesley induced a default—can only be recouped from the payments on the second sale notes, which Wesley, by design, frustrates" [*Id*.].

In the response, Plaintiffs claims that they have "incurred marketing and sales costs associated with selling its inventory of timeshare interests" [Doc. 250 p. 8]. The Court does not have sufficient information to determine whether Defendants' discovery requests are proportional to the needs of this case or whether there are less burdensome means for providing this information. Plaintiffs state that they have provided the "range of out-of-pocket expenses, including sales commission" [Doc. 250 p. 22], but without more, the Court cannot discern whether this range is sufficient. The Court therefore orders the parties to meet and confer on this issue. To the extent

25

the parties reach another impasse, they may alert Chambers.

The parties also dispute RFP No. 16, which states:

> RFP No. 16. Produce documents sufficient to identify all "exit fees" You were paid on behalf of Diamond timeshare owners that have been identified in this case as having their timeshare interest cancelled or terminated.

[Doc. 284-1 p. 23]. Plaintiffs objected that they do not charge exit fees, but instead, Defendant Wesley charges them [*Id*.].

Defendants state that while Plaintiffs may not refer to a charge as an "exit fee," they do "charge owners a fee to return their timeshare interests through [the] Transitions Program" [Doc. 284 p. 12]. Defendants claim:

> These fees are relevant to the issue of whether Diamond sustained any harm as a result of Wesley's actions, because they show that on top of (1) having received full payment for the returned timeshare interest and (2) recovering the timeshare interest itself, Diamond (3) charged its owners an additional fee for the privilege of giving back their timeshare interest, all while giving the owner no credit for the tens of thousands of dollars that he or she had paid for the timeshare. These fees are further evidence that Diamond likely profited, rather than suffered any harm, when Wesley customers returned their timeshare interests to Diamond. Documents responsive to RFP 16 must therefore be produced.

[*Id*.]. Plaintiffs state that they do not charge an "exit fee," and therefore, "as written, there are no documents responsive to Wesley's request" [Doc. 250 p. 22]. Plaintiffs contend that Defendants have not "actually asked for financial records related to Diamond's Transitions program, whether for Wesley customers or other, irrelevant Diamond customers, [and Plaintiffs] will not further burden the Court with a debate that has not been properly joined" [*Id*. at 23].

The parties' primary disagreement relates to the language Defendants use in this discovery request. But the Court finds "exit fee" can be fairly interpreted to mean the fees associated with cancelling timeshares. The Court finds that Defendants have shown how this information is

26

relevant and proportional to the needs of this case. *See* Fed. R. Civ. P. 26(b). The Court **ORDERS** Plaintiffs to respond to this request **within ten (10) days.**

The parties dispute RFP No. 27, which provides:

> RFP No. 27. Produce documents sufficient to identify all other expenses You incurred relating to Diamond timeshare owners that have been identified during discovery in this case as having their timeshare interest cancelled or terminated.

[Doc. 284-1 p. 24]. In response, Plaintiffs made several objections, including that the discovery request was overly broad, vague, and seeks irrelevant information that is not limited to the relevant time period [*Id.* at 24–25].

Defendants claim this discovery request seeks relevant information to determine whether Plaintiffs were harmed. Plaintiffs respond that this "request is likewise drawn from [Defendant] Wesley's financial reporting, not [Plaintiffs]" [Doc. 250 p. 23].

The Court construes this request to seek information relating to any expenses Plaintiffs incur when they canceled a timeshare owned by a Wesley customer. Further, in their opposition, Plaintiffs state that they "(1) incurred costs as associated with recovering defaulted interests, (2) incurred carrying costs (e.g., maintenance fees) prior to sale, and (3) incurred marketing and sales costs associated with selling its inventory of timeshare interests" [Doc. 250 p. 8]. The Court finds this discovery request seeks relevant information that is proportional to the needs of the case. Plaintiffs shall respond to this discovery request within **ten (10) days.**

**4. The Ninth Set of RFPs Nos. 3, 11(g), and 12.**

With respect to No. 3, it requests that Plaintiffs produce certain customers':

> documents, data, information and/or ESI that show each reservation or booking made at any time by or on behalf of each such customer including but not limited to any such reservations made online, in-person, and/or by phone. This request includes, but is not limited to, any bookings or reservations using any points or deeded timeshare

27

> interest for any accommodations, cruises, flights, vehicle rentals,
> jets, shopping, and tours.

[Doc. 284-1 p. 111].  Plaintiffs objected to this discovery request but "agree[d] to produce electronic data sufficient to identify customers' usage of their Collection points from 2018 through present" [*Id*. at 111–12].

Defendants argue that while Plaintiffs claim that they are "responsible for [their] loss of relationships and customers[,] . . . if Diamond owners could not use their timeshares, or simply were not using them, that fact would be directly relevant to whether [Plaintiffs] had any relationship to lose with its customers at all" [Doc. 284 p. 13].  In addition, Defendants argue that "if the customer was not booking trips, [Plaintiffs] were free to rent the equivalent of those points to third parties for profit" [*Id*.].  This is relevant, Defendants argue, to whether Plaintiff suffered "any relational or monetary harm at all" [*Id*.].

Plaintiffs respond that they produced more than what this discovery request seeks, explaining that they have "provid[ed] details regarding every use (or non-use, as the case may be) of a member's points—whether for reservations or otherwise—during the relevant discovery period" [Doc. 250 p. 23].  Plaintiffs contend that "[t]here is nothing to compel" [*Id*.].

Considering what Plaintiffs represent that they have already produced, the Court finds that they have satisfied their obligations with respect to this discovery request, and Defendants have not explained why Plaintiffs' prior production is insufficient.

The parties dispute RFP 11(g), which provides:

> RFP No. 11(g). Produce complete copies of each Standard
> Operating Procedure and each policy which applies to any of the
> following: the criteria for or circumstances when adjustments may
> be made in any contract terms, for the purchase of any timeshare
> interest, including but not limited to the price per point, the interest
> rate, or any other payment term[.]

28

[Doc. 284-1 p. 112]. Plaintiffs objected based on relevancy and proportionality [*Id*. at 113–14].

Defendants state that "[t]hese documents are relevant to [Plaintiffs'] ability and flexibility to sell points at increasing prices and to adjust contracts with Diamond owners when the circumstances demand" [Doc. 284 p. 14]. According to Defendants, "[t]his is relevant because [Defendant] Wesley often assists owners in negotiating adjustments to the contracts and [Plaintiffs'] willingness in that regard which demonstrates the effectiveness of [Defendant] Wesley's services" [*Id*. at 14]. Defendants state that "more than 40% of Wesley's Diamond-related customers get mutually agreeable adjustments or releases from [Plaintiffs]" [*Id*.]. Defendants argue that such "shows that what [Defendant] Wesley does it legitimate and that [Plaintiffs have] procedures for dealing with owners who have been lied to" [*Id*.]. In addition, Defendants state that two individuals employed with Plaintiffs "testified to the fact that [Plaintiffs] take[] into consideration claims of misrepresentation and often adjust[] or cancel[] contracts with owners on that basis" [*Id*. (citation omitted)]. Finally, Defendants contend that Plaintiffs' "ability to resell the points for far more than they were sold for on prior sale cycles is directly relevant to whether [they] suffer[] any injury when [they] resell[] points" [*Id*.].

Plaintiffs label this discovery request as "abusive" [Doc. 250 p. 23]. Plaintiffs state that Defendants have requested them "to produce documents that would give [Defendant] Wesley step-by-step instructions on how to deliver the service [Defendant] Wesley has been deceptively selling to its customers for years" [*Id*.]. Claiming that they are trade secrets, Plaintiffs argue that a confidentiality order would not sufficiently protect them from abuses [*Id*.]. Further, Plaintiffs state that the discovery request does not seek relevant information, arguing that "[w]hether [they have] procedures for dealing with [their] own members who they have been lied to is not in dispute" and that they do have policies to assist their members [*Id*. at 24]. Plaintiffs dispute that this discovery

request will provide evidence to legitimize Defendant Wesley's services [*Id*.]. Plaintiffs state that "[t]he only evidence of what Wesley's services consisted of, and whether Wesley successfully delivered those services, necessarily comes from only two sources: (1) Wesley's records, which detail what Wesley did for its customers, and (2) Diamond's records that detail the outcome of those services" [*Id*. at 25]. According to Plaintiffs, those "have already been produced by the respective party" [*Id*.].

The Court finds that Defendants have not shown how the policies relating to Plaintiffs' adjustments in their contractual terms are relevant to the issues in this case. Defendants argue that this discovery request seeks relevant information because it will demonstrate that Defendant Wesley's services are effective. But Plaintiffs' policies do not make it more or less likely that its services are effective. As Plaintiffs explained, what is relevant is what did Defendant Wesley do for its customers and what did Plaintiff do in response. The Court therefore will not require Plaintiffs to supplement their response.

Defendants' RFP No. 12 seeks "each 1099 C generated" by Plaintiffs with respect to "all Wesley customers disclosed to [Plaintiffs] and for those deposed in this action" [Doc. 284-1 p. 114; Doc. 284 p. 14]. Plaintiffs responded with objections but noted that it would produce "for Wesley's customers whose timeshares have been confirmed to have been closed, 1099-Cs related to loans associated with Collection interests terminated from 2018 through present" but that they have "not sought to locate, and to the extent any exist, [they are] withholding all other 1099-Cs associated with Wesley's customers" [Doc. 284-1 pp. 114–15].

Defendants state that Plaintiffs "should have to produce all 1099-Cs for every customer at issue in this case" and that they "directly refute any claim of monetary harm due to unpaid loans because they show 1) that the collateral is worth as much if not more than the loan balance and 2)

30

that the apparent creditor – i.e., the owner of the defaulted note – is not one of the Plaintiffs in this case" [Doc. 284 p 15].

Plaintiffs respond that "[t]hese are tax documents required because [Defendant] Wesley's inducement to default creates taxable debt forgiveness income to its customers: [Doc. 250 p. 17]. They claim that they have "produced all relevant 1099-Cs" [*Id*.]. Specifically, they "agreed to produce the 1099-Cs for Wesley's designated former customers . . . issued from 2018 through present, because the only Wesley customers that are within the scope of this case hired Wesley in that period" [*Id*. 17–18 (footnote omitted)]. To the extent these documents are relevant, Plaintiffs contend that the "only 'values' that would be relevant are those of the interests [Defendant] Wesley was hired to terminate" [*Id*. at 18]. Plaintiffs have produced these [*Id*.].

Based on Plaintiffs' representations, the Court finds that they have sufficiently responded to this request, and Defendants have not sufficiently explained why Plaintiffs' production is not sufficient.

## IV.  CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Compel [**Doc. 284**].

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin

Debra C. Poplin
United States Magistrate Judge

31